Good morning, may it please the Court. I'm Dennis Niles. I'm here on behalf of Appellant. The case has been extensively briefed. I want to emphasize a couple of points to get us into the issues. I really divide it up into two different aspects. Number one, I respectfully and continue to disagree with Judge Mulway's determination that the Young decision and even more closely the waste management decision of the Fourth Circuit is not dispositive of what I call the threshold issue, and that is whether or not a regulatory measure as inartful and over-inclusive as this that has the effect on a licensed vessel that this does is not invalid on its face. We continue to maintain that a regulation that bans the operation of a vessel, not because of its effect on the water column or its inhabitants, but because of the activity taking place on the vessel, is unlawful. And that's why, again, we look to the waste management case. My understanding is it's not because of the activity taking place on the vessel, but because of the activity of the vessel, i.e. going very fast and so on. Well, that raises the second layer of concerns. They are attributing to parasailing attributes that we showed in moving for summary judgment simply don't exist. In other words, they basically are citing two different impacts, one acoustical and the other an actual physical impact with a humpback whale. And we demonstrated why, whatever they thought about Thrillcraft, parasailing wasn't it. Indeed ... In this case, in this context, you most certainly do. Well, our case law says, the Supreme Court's circuit law says that we don't. Well, if you look at what the Supreme Court said specifically in the United States versus Locke in remanding the conflict preemption cases, issues in that case, they remanded for the development of a factual record, and I believe they call it a full factual record. But Locke is a different kind of a preemption case. It's basically a field preemption case. No, there certainly were elements of field preemption in Locke. The double hollow. Right, but there were also the manning requirements, the language requirements, English speaking requirements, issues of that nature were clearly conflict preemption. And it was those issues that were remanded to ... It was a little unclear whether it was to go back to the circuit. That's really a different question than what I asked you, because it sounded to me like what you were arguing was that the legislature could not have rationally concluded based on the record that it compiled, that these vessels actually interfered with the mating and so on in the habitat of the humpback whale. And we don't, as an appellate court, sit as a super legislature to re-examine the legislative background. The question would be a good one, if I may be so bold, if we were here arguing on the basis of dormant commerce clause, or if we were arguing whether or not this was legitimately within the police power of the state outside of this context. This is not a substantive due process case. This is not a dormant commerce clause case, as much as the state would like to make it so in order to have the benefit of the minimal constitutional protection that comes into play, the low threshold of review that comes into play in such circumstances. I thought I heard you arguing that at the very beginning of your argument that the problem here was that the legislature was wrong in concluding that the operation of your client's vessels actually interfered with the humpback whale. Did I misunderstand the point you were trying to make? I probably misspoke, because it isn't whether or not the legislature got it wrong. That they got it right with respect to, first of all, the threshold issue of whether or not a ban of parasailing is akin to the ban in Yonge or the ban in waste management. We maintain the district court didn't get it right, that there isn't a difference between hauling municipal waste at issue in waste management and banning parasailing as an activity. Because again, they were attributing in waste... It's not banned completely. It's regulated. It's excluded from certain zones during particular times of the year. That's a little different from telling waste management, thou shalt not bring a barge up the James River loaded with New York City's garbage. There is no difference, your honor, between the three rivers at issue in waste management and the navigable waters in Maui County. Because the effect of the ban is to preclude this activity anywhere within these waters surrounding these islands. Or a portion of the year during the mating season of the humpback whale. Right. Then the question becomes, is that partial restriction for conservation measures, which is a part of the Reconciliation Act, or whatever it was, that changed the law, whether or not that constitutes the equivalent of a complete ban on the use of your vessel under their Coast Guard license. Am I correct? That is the issue, and again, we've made the argument, and again, the argument, to sum it up, and I don't want to spend too much time on it because I think it speaks for itself, but the argument is, they have marginalized the ability to prosecute the navigational rights guaranteed by this license for five months. That is a substantial impairment of a right that federal law clearly guarantees the holder of the license. My position is, because... Does it not? Reasonable restrictions, the Detroit case, for example, where you can't run smoke out of your smokestack while your ship is tied up at the pier, how is this different from that? There you have an ordinance that doesn't target a specific type of vessel, attributing to that vessel a particular impact, which we negated in moving for summary judgment. Because it was essentially neutral, very similar to, I would submit, the aerial advertising ban that was at issue in SkySign. It was not something that really targeted. But now we're back to, I mean, we keep dancing around the issue, and I appreciate where you're coming from, counsel. We're still back to the question of whether or not this is a reasonable restriction, whether or not the legislature of the state could conclude that the parasailing activities, which necessitate high speed maneuvering by these vessels, interferes with the mating and habitat of the humpback whale. Well, let's move to that question. I just wanted to emphasize the point that that is not the inquiry that occurs at the first level of my argument with respect to, is this ban the equivalent of the ban in young and waste management? We argue it is, and through the record below in opposing the state's motion, we've made that case, and it is what it is. All right, if it is not on its face invalid because of conflict with the licensing privilege under the documentation at issue here, then the question becomes, how do we go about analyzing whether or not this falls within the narrow exception that Congress and the courts have recognized in two instances, the Huron Reasonable Conservation Environmental Measures, and the second category that certainly the Lock Court talks about, measures related to the peculiarities of local navigation. Well, they've never tried to defend this based on the peculiarities of local navigation, so we can take that off the scale. Where do we begin the analysis? I submit that where the court erred in granting their motion for summary judgment committed two fundamental errors. First, it granted summary judgment in the face of clearly disputed issues of fact. Now, disputed issues of fact comes into play only if you accept my premise that this court cannot simply defer, as did the district court, to the judgment made by the circuit court, or excuse me, by the legislature. Instead, lock and waste management command that this court take a hard look at the conflict and make a determination based on an evidentiary record, whether or not the measure can be sustained. Basically, I would argue, when I talk about a hard look, I'm talking about a hard evidentiary basis that would show that nothing short of an absolute ban would be necessary to further whatever objective the state had in mind with respect to Humpback Creek. I hear you arguing for what amounts to strict scrutiny as opposed to rational basis review. No, I would not. I know that's what you want. No, no. Well, I understand, but I would not be so bold. There is certainly a parallel in the intermediate scrutiny cases where there are certain areas with respect to gender and race. Where are you getting this from? The case law does not talk, when it speaks of reasonableness, it is not equating reasonableness with rational basis. Those terms are not synonymous. They're usually synonymous. Why are they not synonymous here? Not in this context, Your Honor. Here's why I want to come back to Judge Tallman's point and to make sure I'm making myself understood. You begin with the notion that generally there is a presumption against preemption. What does that mean? Basically that means that, as the state would have it, you defer to the judgment of the legislature. If you can find that it's within the traditional area of police power, you allow them great deference and latitude. That's how they view this case. But we've got an express declaration by Congress through the statutory change that the legislature can regulate in this area. So we know that it is not completely preempted, don't we? That's why we have not argued here, Your Honor, the conflict between the state ban and the humpback whale approach rule. If that's the case, if we're starting from the conclusion that there is not complete preemption, then why aren't we back to what Judge Verzon just suggested, which is simple reasonableness review? I was trying to explain how I get there. In this context, the Lock Court and the cases that came before, namely Rice, make clear that in this area, the regulation of coast-wise activity, I'm not stating it as well as one might, but in this area it is clear from the earliest days of the republic that there is no presumption against preemption. So what does it mean that we do not presume that the law is not preempted? It means that we subject the rules in this area to a different measure of inquiry. We've been told what the measure of inquiry is. First of all, that if there's a complete exclusion, then it's preempted. And second of all, that the state beyond that does retain the ability to enact reasonable regulation on coast-wide trade, right? So the question is is it reasonable? And you're trying to take the word reasonable and make it mean something else. Well, and if I may, you're absolutely right to the extent that you are equating reasonableness in this context to reasonableness under rational relationship review, which defers to the legislative judgment. And we're submitting to you that where you are regulating a federally licensed vessel in this fashion, that it was the district court's obligation not to do that, not to do that. Well, if the appellate courts that set this reasonableness standard meant that, they would have used some term other than reasonable. There's a set of locutions that have been developed with regard to scrutiny questions so that we sort of know what we're talking about. And when you mean intermediate scrutiny, there's language in the First Amendment cases, and there's language in the sex discrimination cases that denotes intermediate scrutiny. And the words are not reasonable. That's not the words. The phrase is substantial relationship to an important state objective. That is not the words that the case will use here. They use the word reasonable. They use, and if you look in the context in which they're used, they're basically referring to a narrow area of concurrence where the states may regulate. This regulation of voting activity is not an area of historic regulation by any state instrument. I think the problem that I'm having is that you want to begin the analysis as if Congress had never spoken in enacting the budget provision which specifically authorized the Hawaii legislature to regulate in this area. If this were simply back to the beginning of a lawsuit before the law changed, I think your analysis would be correct, but don't we have to look at it differently because Congress has now spoken and specifically authorized the state to regulate in this area? So your presumptions, we don't start with presumptions. We start with a congressional authorization to regulate in order to protect and conserve this piece. This case began when it was first filed. It came on the heels of this Court's decision in Young. It was filed primarily on a conflict preemption basis. We moved for summary judgment on a conflict preemption basis. With regard to the MMPA, right? I'm sorry? With regard to the Marine Mammal Protection Act. No, no, no. Initially it was based solely on the license. The first claim of relief count one, I think it was based solely on the license provision. The attention focused as we educated ourselves, frankly, about the preemptive effect of the Marine Mammal Protection Act and it did occur to us as we were litigating the case, wait a minute, we have essentially expressed preemption and so that obviated the need to continue to go down the conflict preemption road. But initially Judge Mulway didn't buy it and that's certainly what brings us here. So no, the section 213 provision in no way vitiates or affects the conflict preemption claim. Why is that so? Congress clearly knew that it was enacting a change in the law that would result in regulation of maritime activities because it knew that we were talking about conservation of marine mammals. Therefore, why should I assume that it was restricted as you want me to restrict it and not be more broadly applicable to impacts on coastal marine guard licenses as well as the Marine Mammal Protection Act? Well specifically section 213 makes no reference to any body of law other than I think the Marine Mammal Protection Act. I mean that was the only, and again it carved out an exception for Hawaii and we're not here arguing about whether or not that really represented the will of Congress or simply the ability of our senior senator to add this line item that has become... Well whoever slipped the right here in, it's the law. Well it is... So the question is how broadly do we interpret it? Well that's right, but that is not the issue that we have litigated in terms of field preemption. My view continues to be quite strong that it does not affect conflict preemption and because of the area that we're in, there is no presumption against preemption and therefore it is incumbent on this court as it was incumbent on the district court to measure this rule whether we say the standard is one of reasonableness or not. It isn't abdicating your responsibility of reviewing it to the legislature, but you have to take a hard look at it and that's why I go back... I just don't see how you get there in the face of the actual language itself that authorizes the state of Hawaii to enforce laws or regulations regarding operation in state waters of recreational and commercial vessels for purposes of conservation and management of compact whales. Congress is pretty clear, clearly contemplating effects on maritime activities in reference to both recreational and commercial vessels. So well, I've never read this provision, and my time is about to lapse, I've never read this provision as exempting Hawaii from the supremacy clause. I mean, and I don't... Clearly it is not within the power of Congress to do that, and it may amend the Marine Mammal Protection Act to the extent that we were relying on express preemption. We've never argued Congress can change that law, but Congress can't repeal literally 200 years from given versus... Can I ask one question? Are you abandoning the attorney's position?  You haven't argued it at all. Well, I understand, and the issue there is whether or not a conflict preemption claim of the sort that we have pleaded and prevailed on is redressable under 1983. It certainly is. Waste management expressly so holds, but field preemption, and that's one of the cases the state side's field preemption and supremacy, that's a different beast. I thought the real issue was whether the fact that the injunction never actually went into effect precluded the fees, which is an interesting question, but it hasn't been argued. Right, and the reason it hasn't been argued, I fully anticipate that this case is going to be remanded, and I wanted to take off the table the issue about whether or not we were seeking to enforce rights under 1983, and we clearly are. Okay. Listen, under 1988, we met the standard under the cases in that we won a final judgment, and the only thing, the ink had dried on that final judgment in permanent injunction. It granted us all of the relief. The argument is that because the controversy was changed by the act of Congress, somehow that vitiates our entitlement to fees. Wasn't that judgment appealed? Wasn't there a notice of appeal of that judgment? Right, but it didn't. And there was an appeal pending when the law was changed. But there was no stay of the judgment. We've not got a final judgment until the appellate process has been exhausted. That is, your entitlement to fees depends on a final judgment in the district court. If you don't seek a stay, which the state did not, if you don't seek to stay that judgment, it is fully enforceable. But it's got to be more than the mere fact that there's a judgment on the books. There has to be some sort of a change in the relations among the parties, does there not? Right. So getting back to Judge Berzin's question, if nothing ever happened because the law changed before the injunction actually went into effect, then where's the change in the respective positions of the parties? Well, I think you have to look at the mandate of the court, and the mandate of the court was to change the relationship. The fact that it was to take place at a future event, or a future time which was overcome by events, does not deprive us of prevailing party status. But if, for example, to take Judge Thompson's line of reasoning, if the statute had not intervened, but the case had been reversed on appeal, you wouldn't have gotten any fees? If it were reversed on a ground that vitiated our – that's right. Right. So basically, that possibility was kind of stopped in the middle because of the statute. So how can you say that you had a right to the fees based only on the final judgment of the district court when they're – essentially, the precondition to the fees hadn't played out yet? The bright line that the courts – because you can have all kinds of mootness issues in it, there are a number of different factors that can happen before a judgment. Someone – a creditor might not – or a debtor – a judgment debtor might not pay. And you haven't collected the money. You've got a viable judgment. You're out there hounding. I'm asking a different set of questions. It's useful to listen to the question. I'm sorry. Okay? I have a fair amount of sympathy for the proposition that if the appeal had run and then what happened happened, even if the injunction never went into effect, I'm not sure whether you'd get fees. I think maybe you would. But that isn't what happened here because the – a precondition to getting the fees was being successful on appeal, right? Because there was an appeal. Right. And there was – So then the appeal was cut short by the intervention of the statute. So at that point, does it make sense for you to have fees when we don't know what would have happened had the appeal run out? Well, there was a reason Congress changed the law because the outcome of the appeal was pretty clear. But my basic point, Your Honor, is absent a stay, and there was no stay of the effect of the judgment. We've just discovered that isn't true. You would not be entitled to get your fees absent a stay until the judgment – the appeal ran. Is that true? Could you have walked in while the appeal was running instead of paying my fees? Certainly. Certainly. It's an enforceable judgment. Now, we didn't have a judgment. We had a ruling of the court. You know, that's one of the complications. The magistrate recommended denial, and the motion for fees was pending at the time the judgment was vacated. Okay, so that – so, I mean, that is – Yes. And we timely appealed from that, and before that could be argued and decided, the law changed, and the judgment was vacated. Okay. Your time is well up. We'll give you a couple minutes for a thought-out. Thank you very much. Good morning again, Your Honor. It's William Weinhoff, Deputy Attorney General, appearing on behalf of state defendants. I think there's still some confusion, and certainly in my mind, as to what appellants are arguing. I think that's – maybe others are confused, but anyway, they pose the threshold issue as whether the statute is invalid on its face, and in their briefs, what they say it's invalid on its face because it's per se unreasonable. So I think what they're doing is – and so I don't know how much I need to get into this – I think they're going past, in my state's analysis, what we have from Young and Heron and all these cases is you have sort of a two-fold analysis. One is whether it excludes, which you can't, and two is whether – if it doesn't exclude, whether it's unreasonable or discriminatory. Well, I'm not sure if the plaintiffs are I think they've given up on that and gone to the idea that it's nevertheless unreasonable if they are – sure. Let me ask, on that first point, there was some back and forth in the briefs about what the extent of this regulation really was. Yeah. You seem to say, well, they can't go in a certain area, but they can go in other areas, they can go – and they say no, it's all of the waters around that. Go ahead. Got it. They're right and I'm wrong on that. What Mr. Niles says is exactly correct. And I just misspoke, so I apologize. So, essentially, it's a total ban for several months a year, but not for other months of the year. Is it – on that activity of the vessel. Using this vote for some purpose, for a certain purpose. Correct. That's right. But not for other purposes. That's right. And the reason that I say that's not – that doesn't rise to the first level of the test is you look at all the cases. You start with Heron, and what you have is you have these scotch boilers, isn't that colorful? It's a wonderful case, actually. You have these scotch boilers that have to be fired up and they're too dirty to do so. If you look at the dissent, which I'm sure you probably have as you read through it. Which case are we talking about? I beg your pardon? Which case are we talking about? We're talking about Heron now, the 1960 case. Sure. So what the dissent is telling us in that case, and it kind of stands to reason, is it's impossible – I don't have the language right in front of me, but I'll get it as I talk. But basically what they're saying is it's impossible to run these ships with – okay, it says here on page 451, footnote 3. It is agreed that it is impossible to prevent emission of the kind of smoke prohibited by the smoke ordinance if the vessel is equipped with hand-fired scotch marine boilers. So, you know, you have a regulation that basically makes it impossible or uneconomical, I guess, what we mean to use that type of vessel. In Douglas versus Seacoast Products, you have a ship that comes from out of state and wants to do Manhattan fishing. The regulations – Douglas is an interesting case and very similar to ours in some ways because the regulations at question there, actually it's footnoted with respect to that too, is it says the regulations prohibit – I'm looking now on page 269 – the regulations prohibit anybody from Manhattan fishing between the third Monday of May and the third Friday of November. But we don't go off on that in that case. What we go off on is they got a fishing license, not a coast guard license, similar, but the point of a fishing license is it says you can fish for anything. And so they got a fishing license from the feds. And nevertheless, Virginia says, well, people from Virginia can fish in our waters, but people from other places can't. What about the barge case, though? The waste management case is a case in which – Because there they seem to be saying, well, they didn't say you couldn't run your barge down the river with some stuff on it. Correct. That's right. Let me pull off that case. I have it right here. Young. Oh, no. Waste management. Okay. The regulations in that case, there was five of them, and that's why the case is actually so long because they don't really get to the part that's analogous to ours until way late in the case. The second statutory provision, the stacking provision, requires Virginia's Waste Management Board to promulgate regulations prohibiting stacking of more than two containers. And the third statutory provision pertains to barges, prohibits the commercial transport of hazardous or non-hazardous waste by ship. Yeah. So you are exactly right. And so what the court said then, what that court said is it went through and it talked about Douglas, anyway, and said the provision that we're now familiar with and I think we're dealing with, states may not exclude but may impose upon federal licensees reasonable non-discriminatory conservation and environmental protection measures within their police power but may not exclude. So what the court did with that is what it said is, and I did talk about this and so did Judge Mulway, says the Three Rivers Ban completely excludes federally licensed barges, uses the word exclude, but it goes on to say from transporting any type or amount of waste, the reasonableness of such a complete ban is simply not supported by the evidence. So it wasn't, despite the fact that they used the word exclude, it was not an exclusion case. They looked at it and they said there's no evidence for reasonableness in the record. And they said the reasonableness of such a complete ban is simply not supported by the evidence in the record. Right. So it's basically what they're saying. It's a per se unreasonable because there isn't any evidence for it. But how does that dovetail with your position with regard to how we do the reasonableness review, which as I understand it is we essentially look at whether the legislature had a right to stand on it. Right, right. And let me go ahead. I mean, basically, as I understand what plaintiffs are saying is they're saying you don't have a presumption of, you know, the preemption cases typically say that the court's going to try not to find a conflict and we're going to go off on that base. And they say, well, that presumption doesn't apply here. Well, there's two problems with that The first problem is that's just simply not correct based on the cases. And the second one is, so what? It doesn't get them anywhere. You're still using the word reasonable. And here's what I mean by that. The first reason it's simply wrong is because the cases where we come up with this cannot exclude but can nevertheless have reasonable nondiscriminatory regulations. Those are exactly the kind of cases that they're talking about. Specifically Douglas. Douglas is the same kind of case we have here. It's a fishing license. But their argument is the presumption doesn't apply here and therefore it means reasonable means something other than reasonable because But the waste management case does seem to be doing something other. It then goes on to say that with regard to the stacking provision, that there are genuine issues of material fact regarding the health and environmental risk. So they are looking at it as an evidentiary issue to be proven before the court. And not one that simply says, did the legislature have some basis when they enacted it? See, they don't really talk about what is it that they're going to go back and do. And so I just don't know the answer to that. And I don't know what happened after that either. Maybe I'm reading this differently. I thought that what the court was talking about was you've got a complete ban on a particular type of cargo, which is MSW, right? Some sort of solid waste. New York City's garbage. You can't carry it. Then you've got a second ban that even if you're going to be transporting waste in containers, you can't stack the containers more than two high. That's correct. And that's a different issue. That's a Coast Guard safety regulation type issue. And what I see the court saying is the prohibition on the carriage of municipal waste is a complete ban. And that's a problem. The other issue with regard to stacking containers more than two high is an issue that might conflict in an area that has been completely preempted by Coast Guard regulation. Yeah. That's a vessel safety issue. That's certainly a reasonable way to read the case. Frankly, the case is difficult. I mean, as you know, it's 36 pages long and you're talking about basically half a page in which they're talking about our particular issue. And it's not really fleshed out, to be quite frank. And it's not really that easy to figure out exactly what it is that they're saying in that respect. On a slightly different point, do you think, as Judge Tallman was suggesting, that the new statute bears on the current question of not MMPA preemption, but preemption via the license? I originally didn't think so. I think it bears on it. I have to say, you know, just standing here as an officer of court, I'd like to say, you know, that's it. Thank you very much. But I think that the thing that, I mean, it clearly is telling us something about what Congress thinks. But the difficulty with arguing that that 213 is the answer to the question that we're here on today in the same way that it was the answer to the question with respect to the MMPA, is it starts off with the language, notwithstanding any other, I'll get it in front of me, notwithstanding any other federal law relating to the conservation and management of marine mammals. So it doesn't say notwithstanding, you know, any laws relating to Coast Guard licensing. So I think it is somewhat limited in that respect. And I don't think it's the end of it. We start with the Marine Mammal Protection Act that says that you can't harass or annoy whales. And the whole basis for the legislative action was that the operation of these parasailing vessels harasses and annoys humpback whales while they're mating and disturbs their habitat. Well, you know what? I mean, yes, but you've got into an area where I wanted to make sure that I made a point that I hadn't really made in the briefs. Yes, you're absolutely right. Yes, but that wasn't the only reason. That wasn't the what? That wasn't the only reason that the court, that the legislature came to this conclusion. Well, they talk about the safety issue. Is that where you're going? No. What I want to point out is if you look at the opening brief, the original act is in there at tab 10. And we're talking about Act 313. The legislature finds that high-risk craft, there is a safety issue. You're right, and I was wrong. I'm sorry. The second one is sea creatures such as migratory humpback whales and sea turtles. And the third reason for it, I mean, there's a melange of things here. And the third reason is the operation of thrill craft and high-speed motorized vessels in the waters of the state pose a visual and aural, aural meaning listening, AU, nuisance to the residents in the communities in which they are operating. And there's evidence for that also in the record. In my supplemental excerpts of the record at page 91, anyway, I just have one of the things, there was a we don't like parasailers because they're noisy and they don't look good and they're annoying. And to me, that's why going back to this full circle, back to this reasonableness issue, I mean, you're right within the ballpark of the kind of things that's always left to the legislature. This isn't just regulating, you know, going out in the ocean and trading between New Jersey and New York. This is visual and aural nuisances. Well, clearly, if the Hawaii legislature has decided that the peace and beauty of Lahaina is disturbed by parasailers and their noisy boats going by, we're just going to forbid them entirely. That would cause a major problem with regard to the Coast Guard license. Because they are clearly engaged in the coastalized trade and they are so licensed as federally licensed vessels, right? You know what? I have to say that I don't agree with that. I hear what you're saying. Do you think the state could completely ban them, say, within a three-mile limit on them? Yes, I do. I do. I think I certainly think we have... I'm not sure opposing counsel will agree with that. Okay, well, and you know what? I don't want to argue that case because I got a lot better case here. I got a lot better case than that. But I don't want to say no to that. But, you know, the point is, again, going back to the reasonableness thing, we're exactly in the wheelhouse... Well, what... I mean, where are the limits here? I mean, here we have a five-month ban in a very big area of the... at least the activity for which this boat was constructed and used. Maybe it can be used for something else, but that doesn't seem like what they might be doing. Well, it certainly can be used for something else. They can't make money using it for something else. I mean, I think that we'd have to accept that from the... All right, so if it were an 11-month ban or if it were... I mean, is it because you can still float the boat around even though they have no reason to, or is it because it's only a five-month ban? I mean, what is... This really is not an reasonableness problem. It's really a... At what point is there an exclusion that matters? Well, in Douglas... What's the line going here? In Douglas, they couldn't take it between... Was it they couldn't take it or they could only take it? I want to make sure of this. Yeah, I think they could only take it between May and November, so I guess either way that's six months. They could take it six months and they couldn't take it six months, so it seems to me that regardless of what the limits are... I think that's a difficult question, but it's a difficult question either way, Your Honor, because if you're going to start talking about a regulation... See, that's when you get back into the first test. If you start talking about a regulation as being an exclusion, then where do you draw the line the other way? What if you have a boat that can only make... Makes money going up in... A Coast Guard-licensed vessel that makes money by driving 30 miles an hour up and down 50 feet off the beach? But haven't we faced these same sorts of arguments in fisheries regulations where we're talking about very limited seasons and whether or not it's commercially viable to continue to pay the mortgage costs on the vessel if it can only fish two weeks out of the year? I think you do face similar types of questions, and I think the answer is the fact that... Again, I know that there were taking cases. I remember a taking case. You guys asked me I cited one yesterday, and so I'll venture out there, but I remember there was a taking case that I cited in a... I think it was at some point there was a taking claim in this case, if I'm not... I know there was, and I think there was a case in which somebody said exactly that. There was some sort of regulations on their fishing vessel, and they couldn't make any money doing it. Of course, I said, well, that's not a taking. So yeah, I think there is an analogy. There's certainly types of things that restrict things and make it... I mean, that's basically the nature of any regulation. By definition, a regulation makes it more difficult or less profitable to do something. Can you address the fees question briefly? And, you know, there was a recent Supreme Court case this week about fees and preliminary injunctions. So Sol, I think is what it's called. You know that? Well, if you don't, then we won't talk about it. Sol versus Weiner.  This is my problem about the fees. Let's leave aside the set of hypotheticals and situations we were talking about earlier about the fact that this was all in the middle of the appeal. Yeah. But your argument doesn't seem to depend on that, as I understand. Are we talking now about the attorney's fees? We've shifted...  Yes, okay. I'm with you, Your Honor. Thank you. Your argument seems to be that because the statute, this external thing came in, there was a final judgment. Yeah. Right? Then the statute passed, and because of the time limit of the activity or the regulation, it happened that it came in before there was any on-the-ground impact of the injunction, although the injunction had already been issued. Right. At least we have no record. I mean, it could be, for all we know, that in fact the defendant did make reservations or something to use their ship and boat in the meanwhile, but we don't know that. Well, we do know that. I'm sorry, Your Honor, just to make sure. We know that there was a stay of the court's order December 13th, and they didn't...  They might have illegally done it. I don't know that. I understand. But they didn't legally... So there was no on-the-ground impact. Correct. But to me, most of the cases that you rely on are pre-Buckhannon, which is the Supreme Court case that seems to say that at least on-the-ground impact alone isn't enough. You have to have a judge... Pre-what? Buckhannon, B-U-C-K-H-A-N-N-O-N. Oh, Buckhannon. The catalyst case. Okay. And I'm just wondering whether sort of the presumptions or the assumptions of the fee cases didn't switch at that point. Because up until that point, yes, we were concerned about the real-world impact for purposes of being a prevailing party. That's why you could be a prevailing party without a judgment in your favor. Then Buckhannon comes in and says you can only be a prevailing party if you have a judgment in your favor, even if in fact your litigation had an actual great effect. So at that point, do we pull out all the cases on which you're relying, which are concerned about the fact that there was no actual real-world impact? Well, you know, I mean, nobody briefed Buckhannon. I'm, of course, familiar with it working for the state. I mean, as we all know, that's a case in which, you know, the catalyst test was rejected. I certainly did not, since before Your Honor's perceptive question, I didn't think that that was a case that could be read to broad and the right to attorney's fees. And I don't believe that it addressed any of those things. It's not directionally on point, except it seems to switch gears as to what matters here to make somebody a prevailing party. Okay, but the other thing is, now I do have another, I believe I have a pretty powerful rejoinder to that, and that is you have your Ninth Circuit case that's certainly after Buckhannon. The Martinez case? Might be. I'm not sure what's after. I think it's the, well, I'll find it if I have it open to that case area. Yeah, but, no, I'm thinking of Garamendi. Garamendi was the 2005 case, and it's still citing Hewitt, and it's talking about the materially alters relationship. So I feel pretty confident, Your Honor, that Buckhannon Where is that in your brief? It's on page 36. Buckhannon, I mean, certainly altered the landscape, but I don't believe it altered it favorably to plaintiffs. I don't think there's, I don't see that in the case, Your Honor, and it's not in Ninth Circuit jurisprudence. And the other point I would like to make on attorney's fees, two more points. First of all, the question of the dialogue was absent a state. You know, it's interesting, because the quote that you, from Gerling on page 36, it's actually in substantial tension with Buckhannon. It seems to be wrong, because it says that the plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, that's right, or comparable relief through a consent decree or settlement, and that is not sufficient under Buckhannon. So it seems to be operating on an old premise. No, I, you know what, Your Honor, what I recall of Buckhannon was Buckhannon, it seems to me it's, well, Buckhannon tells us you certainly don't have to obtain a judgment, I'm okay with that, but you have to obtain some sort of ruling from the court that alters the legal landscape. Well, I don't, I believe, Your Honor, and I submit that it's still the law in the Ninth Circuit and it's still the law in the Supreme Court that in order to become a prevailing party, you have to have more than a judgment, you have to have some relief on the ground. I believe that's still the law. And the other point I wanted to make is, two points, first of all, it was there was a discussion of absent a stay, well, we got a stay, we didn't get a stay the day the thing happened, which would be your paradigm case, but we got a stay before there was any alteration in the legal landscape, number one, and number two, I don't want to give this point up, and I know the court is aware because, I mean, first of all, you are, and second of all, I was over here arguing the same thing yesterday, this is not a 1983 case at all. It's a Supremacy Clause case, and the cases are very clear. But we know that some Supremacy Clause cases are 1983 cases, like Golden State and Levada's, right? Yes, that's right. And here you have somebody who is sitting there with a license, right? But their federal right is a license, i.e., the right to go sailing around outside in the water. Why isn't that a right? It's, you know, for the same reasons that I talked to you about for 20 minutes yesterday, there's not any case anywhere in the country that says that this 46 coast-wise license thing is the kind of thing that gives rise to a 1983 cause of action. There simply aren't any cases. It's a classic right, i.e., the right to sail around Maui. But it's not the kind of case where, I mean, you go back to Gibson or Gibbon, and you go back to Huron, and I think, I believe, Your Honor, and I think if I had briefed it more thoroughly, I would have... The thing is, again, waste management was so long. I don't believe there's any discussion of 1983 in that last half page with respect to that. I'll grant you that, but the headnote begins, Landfill operators and transporters commence Section 1983 action against Virginia. But, I mean, you'd have to look at that to see, did they argue a 1983 case with respect to that particular thing? I'd be willing to bet, Your Honor, if you had the pleadings with respect to that, they wouldn't say that that was a 1983 case. They had a commerce clause case. They had equal protection. They had all kinds of things, and I'll bet you with respect... I mean, I don't know, but with respect to that provision, I'll bet you it was a supremacy clause case. And now, I mean, as Judge Berzon said, sure, I mean, it can be a supremacy clause case and a 1983 case. But, anyway, I don't think we have that here. I don't think that... The Buckhannon question is a great question that I frankly hadn't thought of. I don't believe, from what I know of Buckhannon, that there's anything in Buckhannon indicating that it altered the legal landscape with respect to this case in a way favorable to plaintiff. If anything, it's the other way. And, finally, Your Honor, I'm sorry, you had mentioned the Soule v. Weiner case. I looked at that, and I didn't bring it up because, you know, it seemed to be a relatively narrow decision. I mean, I guess it does still continue to indicate that the Supreme Court is more interested in narrowing 1988 than expanding it, but the specific holding, as I read it, was that if you had a preliminary injunction, that didn't necessarily mean you were the prevailing party with respect to 1988. And I don't think that's really applicable here because, I mean, the truth is, and we all know that they had a permanent injunction. The problem with it is it just never did them any good. There's no question about that. Thank you. Okay, thank you very much, counsel. We'll give you a couple minutes. Just very briefly, footnote 12 of the waste management case specifically talks about 1983 and how the conflict preemption claim was regressible through 1983, so it expressly states that. Again, that's footnote 12 on page 28 of the, well, it's actually page 348, if I'm reading this correctly. In any event, I just want to take a moment to address the one additional example that Judge Tallman gave me with respect to why this court may not defer to the legislature in passing on the reasonableness, and that has to do with the oral impacts. The notion that you can hear a parasail towboat from 50 yards, let alone from being on the beach, is patently false, and it was refuted in our moving papers below. The exhaust on these boats is discharged through the propeller underwater. You cannot hear these boats, and so the notion that the oral impact on people standing on shore justifies this legislation is simply, I'm not sure what the edge is. But what it does do, it illustrates why you cannot, in protecting these federal rights, defer to a legislature that can, as counsel puts it, has a melange of reasons thrown up as finding a justification. No, indeed, what it was the response... But even if you exclude that, and just look at the conservation protection rationale, that's good enough, isn't it? That's the objective. We have to look at the means, and this case has been from day one about the means chosen. They have extensively regulated on speed, areas of operation, number of boats that can engage in the activity. We're not here challenging any of those things. What we're challenging is the notion that parasailing, in and of itself, may never be conducted in a way that avoids impacting a marine mammal or any other living thing, and it is that premise. But now you're getting back to a question that I think I discussed a little earlier, and that is under the Marine Mammal Protection Act, the statute speaks in terms of harass or annoy, which federal case law has interpreted very broadly to prohibit virtually any activity that may somehow interfere with the marine mammal, or cause it anxiety. I guess if I could put it that way. No question, and in exercising that authority, the National Marine Fisheries Service has established the 100-yard approach rule, and it has determined that if you respect the approach rule, you come no closer than 100 yards, you're not likely to harass or annoy. But the legislature relied on the testimony of these PhDs who have spent their lives studying the humpback whale, and relied on a substantial amount of scientific reports saying that these whales are very sensitive to acoustical noise. They did not present a single peer-reviewed article to the legislature. There was no testimony by anyone with a... The memo says that we do not engage in Daubert-style analysis in questioning the judgment of the legislature, and accepting that kind of evidence. If indeed we are simply going to review the ban under the rational basis approach that would be taken in the garden variety substantive due process, dormant commerce clause case, you would be right. I am suggesting where we are talking about important federal rights... I suppose you had a fishing regulation, right? You can only fish a couple of weeks a year. Why? Because some people went to the legislature and said that if you fish other times, you're going to interfere with the spawning or something. Are we going to prove that up in court every time? Sure, because there you're talking about taking and regulating the taking of a species of aquatic life. I understand that, but your premise would be the same. Why isn't the premise the same? You have a fishing license, but the state limits the amount of time you can fish. Right, and the best response that I can have when we're talking about non-migratory species in local waters... Historically, the states have regulated mackerel fishing, Manhattan fishing. They've been doing this for centuries. This is an area that is customary within the jurisdiction. Here we have the state of Hawaii taking it upon itself to regulate and legislate boating activity in proximity to migratory whales when the national agency itself has determined that's not necessary to ban the activity. What I'm submitting to you is we have an area of... It's not regulation, it's prohibition in an area where the states do not have a historic role. We're talking about where we have these two interests, the federal interest and the state interest, and they're coming together and we're now standing before the court and deciding how do we strike that right balance? I'm simply saying the court was wrong in granting summary judgment. It should have made findings on the basis of admissible evidence and then made a ruling so that you ultimately would be in a position to judge whether or not the court got it right. Okay, thank you very much. Thank you for your helpful arguments. The case of UFO shooting of Hawaii v. Young is submitted. And we will go to the last case of the day, which is the Lucas case. Lucas. Thank you.
judges: Thompson, Berzon, Tallman